FIRST NATIONAL BANK OF CHICAGO v. MINERAL WELLS & LAKEWOOD PARK STREET RAILWAY COMPANY.

Decided January 19, 1911.

1.—Appeal—Final Judgment.

A judgment, though varying in its terms from the only relief authorized by the nature of the action, is held to be such adjudication of the issues involved as to support an appeal.

**2.—Contract—Rescission—Following Proceeds.**

In order to support the right of a vendee to rescind the contract and recover back the purchase price from a bank to which he had paid the seller's draft therefor, the bank must be chargeable with collusion in the fraud or wrong of the seller; and the vendee must tender back the property bought. His retention of it is an election to affirm the sale and proceed for damages on his warranty.

**3.—Draft—Innocent Purchaser—Bank—Payment.**

A bank which in good faith gives a customer credit for the amount of a draft drawn in his own favor on a purchaser of goods from him and indorsed to such bank, the proceeds being placed subject to the customer's draft, is protected as an innocent purchaser. After payment of the draft, it is not liable to the payor for the proceeds in an action based on breach of warranty of the quality of the goods made by the seller.

**4.—Same—Cases Distinguished.**

State Bank v. Blakey, 35 Texas Civ. App., 87, and Van Winkle Gin Company v. Citizens Bank, 89 Texas, 147, distinguished from this case.

Appeal from the District Court of Palo Pinto County. Tried below before Hon. W. J. Oxford, Judge.

*Gross & Allen* and *Smith, Turner, Bradley & Powell,* for appellant.— A deposit being made by a depositor in a bank, in the ordinary course of business, of money, or drafts or checks received and credited as money, the title to the money or drafts or checks is immediately vested in and becomes the property of the bank. Craigie v. Hadley, 99 N. Y., 133; Brooks v. Bigelow, 142 Mass., 6; Metropolitan National Bank v. Loyd, 90 N. Y., 534; Scott v. Ocean Bank, 23 N. Y., 289; Story on Bailments, 88; Keene v. Collier, 1 Met. (Ky.), 415; Brahm v. Adkins, 77 Ill., 263; Chapman v. White, 6 N. Y., 412; National Bank of Republic v. Millard, 10 Wall., 152; Clark v. Merchants Bank, 2 N. Y., 380.

It is held that the bank is not only the owner of the paper, but is not the warrantor of the goods sold and bill of lading attached. Blaisdell Co. v. Bank of Tyler, 96 Texas, 626; Commerce Milling & Grain Co. v. Morris & Parker, 27 Texas Civ. App., 553.

It was error on the part of the court to give a peremptory instruction for the plaintiff railway company, and it was also further error not to give a peremptory instruction in favor of the Bank of Chicago. Insurance Co. v. Calvert, 100 S. W., 1033; Cobb v. Beall, 1 Texas, 342; Crozier v. Kirker, 4 Texas, 252, 51 Am. Dec., 724; Wells v. Barnett, 7 Texas, 584; Kimbro v. Hamilton, 28 Texas, 560; Golden v. Patterson, 56 Texas, 628; Overall v. Armstrong, 25 S. W., 440.

*J. F. Ranspot* and *Penix & Everhart,* for appellee.—The court did not err in peremptorily instructing a verdict for appellee because (a) the undisputed evidence shows that the Block-Pollak Iron Company was at the time of purchase of draft by appellant and all times thereafter solvent; (b) that the First National Bank of Chicago was not an innocent purchaser of the sight draft in question; (c) that the First National Bank of Chicago had in its possession at all times since it received said

draft sufficient money belonging to the Block-Pollak Iron Company to protect itself against any loss by virtue of the failure or any part thereof of the consideration for which the sight draft was given; (d) that the First National Bank of Chicago was notified immediately of the defects in the consideration for the said sight draft; (e) that both the Block-Pollak Iron Company and the First National Bank of Chicago were non-residents of the State of Texas and both resided in the City of Chicago, Illinois; (f) that there was no contention as to the amount of damages sustained by the appellee on account of the breach of the contract by the Block-Pollak Iron Company; (g) that the appellee could not get possession of the cars of iron purchased of the Block-Pollak Iron Company without first paying the sight draft in question, and (h) that the $1500 held by the Bank of Mineral Wells was a part of the money paid it by appellee on said sight draft. Sperlin v. Peninsular L. & D. Co., 103 S. W., 232; State Bank v. Blakey & Co., 35 Texas Civ. App., 87.

HODGES, Associate Justice.—On the 26th day of January, 1907, the Mineral Wells and Lakewood Park Street Railway Company of Mineral Wells, Texas, entered into the following contract with the Block-Pollak Iron Company of Chicago, Illinois:

"Dallas, Texas, 1/26/07.
"Messrs. Dismuke & Smith, Mineral Wells, Texas.

"Gentlemen: As per our offer of the 24th and conversation with the writer over the telephone today, we now beg to confirm sale to you of two miles of first quality 35-lb. relaying steel tee rails, including sufficient, necessary angle splice bars weighed in, at $38.75 per gross ton (2240 lbs.) delivered f. o. b. cars Mineral Wells, Texas.

"We guarantee to make delivery within thirty days from date, unless delayed by causes beyond our control; and also to furnish only such rails as will pass Robt. W. Hunt & Co.'s inspection—which calls for rails that are straight, free from kinks, curves, laminations or battered ends. All rails to be properly drilled in each end with necessary splice bars to match; 90 per cent of the rails to be 30-foot lengths with the usual, not to exceed 10 per cent of shorter lengths down to 23 feet.

"Terms—sight draft with shipping documents attached.

"This letter of agreement signed in duplicate will constitute a contract between us.

"By J. R. Cohn.

"Accepted:
    "Mineral Wells & Lakewood Park St. Ry.
    "By Marcus M. Bright, Sec. & Treas."

When the rails designated in the above memorandum were shipped the Block-Pollak Iron Company drew its sight draft on the Mineral Wells and Lakewood Park Street Railway Company (hereinafter called the railway company) for the sum of $4136.36, the amount of the purchase price, payable to the order of the drawer. The draft, with the bill of lading attached, was endorsed by the Block-Pollak Iron Company

and transferred to the First National Bank of Chicago, Illinois. The endorsement was in the following language: "Pay to the order of the First National Bank of Chicago. (Signed) Block-Pollak Iron Co." The First National Bank of Chicago (hereinafter referred to as the Bank of Chicago) placed the amount of the draft, less the usual discount, on its books to the credit of the Block-Pollak Iron Company, subject to be checked against at any time, and forwarded the draft, together with bill of lading, to the First National Bank of Mineral Wells, Texas, for collection. (The last named bank will be hereinafter referred to simply as the Bank of Mineral Wells.) A letter of instruction accompanied the draft, directing the Bank of Mineral Wells not to surrender the bill of lading till the draft was paid. On March 27, 1907, the draft was paid in full by the railway company by means of its check drawn on the Bank of Mineral Wells by Marcus M. Bright, secretary and treasurer of the railway company. On April 3, 1907, the Bank of Mineral Wells remitted by New York exchange to the Bank of Chicago the sum of $2623 of the amount collected by it from the railway company on the draft. This left, after deducting some expenses and charges, a balance of $1500 still in the hands of the Bank of Mineral Wells. In a letter which accompanied the remittance the latter bank gave as a reason for not sending the entire amount, that it had been garnisheed "by the W. & M. Co." in a suit pending in the District Court of Palo Pinto County, and it held the $1500 to protect itself and subject to the order of the court. We gather from the briefs of counsel that a short time after paying the draft and securing possession of the bill of lading the railway company filed a suit in the District Court of Palo Pinto County against the Block-Pollak Iron Company for damages on account of the inferior quality of some of the rails shipped, and at the same time procured the issuance of a writ of garnishment against the Bank of Mineral Wells. These proceedings do not appear in the record of the evidence in this case. The following is all that appears in the statement of facts concerning that garnishment: "Plaintiff introduces a garnishment writ which showed that the First National Bank answered that it had $1500, being the remainder left out of the $4136.36 which was paid by the Mineral Wells and Lakewood Park Street Railway Company." It does not appear from the record at whose suit, or for what purpose this garnishment was sued out. At the March term, 1908, of the District Court of Palo Pinto County the Bank of Chicago recovered a judgment against the Bank of Mineral Wells for the sum of $1500, the amount of the collection withheld. We gather from the record that the railway company had occupied in this suit the position of a party defendant, and had been by the court permitted to withdraw therefrom after the parties had announced ready for trial and after the court had heard all of the testimony. On April 15, 1908, more than a year after the payment of the draft, the railway company, appellee in this appeal, filed an amended original petition in the District Court of Palo Pinto County in which it makes the Block-Pollak Iron Company and the First

National Bank of Chicago, the appellant in this appeal, parties defendant. From the judgment rendered in that suit this appeal is prosecuted.

It is stated in briefs of counsel that this amended original petition was the means of making the appellant for the first time a party to the original suit of the appellee against the Block-Pollak Iron Company. After the formal allegations stating the incorporation and residences of the Block-Pollak Iron Company and of the Bank of Chicago, the amended petition sets up substantially the following facts: For cause of action it alleges the making of the contract with the Block-Pollak Iron Company of January 26, 1907, and its breach by that company in failing to ship goods up to the standard purchased. It is claimed that fifty-three of the rails were crooked, kinked, curved and laminated so that they were unfit for use, for which damages are claimed in the sum of $340.80; that one-half of the remainder were crooked, curved, kinked and laminated to such an extent as not to be in compliance with the terms of the contract, and damages for this item are placed at $1500. It is further claimed that the rails were not "drilled in" as provided for by the contract, and that 30 per cent of the splice-bars were missing or crooked and broken, for which still other damages are claimed in the sum of $81.50. The payment of the draft drawn by the Block-Pollak Iron Company, and the reasons for making such payment, were set out in minute detail. It is averred that the rails were shipped C. O. D., and that no means of inspection was afforded till after payment of the draft, and not till then was it discovered by the plaintiff that the goods were not up to the grade contracted for; that the payment of the purchase price was obtained by the fraud of both of the defendants, and they are charged with having adopted this particular method of securing payment before breach of the contract could be discovered by the plaintiff. It is also charged that the appellant had notice of the failure of the Block-Pollak Iron Company to comply with its contract at the time it acquired the draft drawn for the purchase price, or that if it did not have such notice then it did have full knowledge of all the circumstances before it came into possession of the funds paid on the sight draft. It is further averred that at all times between the date on which plaintiff paid the draft and the filing of that amended original petition, the appellant had in its hands, as a bank of deposit funds belonging to the Block-Pollak Iron Company in excess of $1500, "which might have been applied by said defendant, and in equity and good conscience should have been applied to the payment on said sight draft." It is argumentatively insisted that by reason of the fact that appellant had in its possession funds belonging to the Block-Pollak Iron Company which it might have appropriated to the satisfaction of the unpaid balance of $1500 withheld by the Bank of Mineral Wells, the plaintiff is now entitled to the latter fund. It is further charged that the method adopted by the defendants was the outgrowth of a conspiracy to defraud plaintiff by a pretended transfer of the draft, and that the collection was in reality for the Block-Pollak Iron Company. The petition concludes as follows: "That the said

$1500 now in possession of the First National Bank of Mineral Wells is a part of the $4226 paid by plaintiff on the sight draft aforesaid, and that said $1500 in truth and in fact should belong and does belong to this plaintiff as a part of its debt and damages aforesaid and does not in any sense belong to the defendant the First National Bank of Chicago but is being held by it fraudulently for the defendant, the Block-Pollak Iron Company. That the plaintiff believes that the First National Bank of Mineral Wells is about to pay to the First National Bank of Chicago the said sum of $1500, and plaintiff says that if such payment is made that it will lose its debt against the defendants herein to its damage in the said sum of $1500. It therefore asks that a temporary writ of injunction be granted against the First National Bank of Mineral Wells enjoining it from making the payment aforesaid until the issues of this case can be heard and determined. Wherefore it asks that citation issue to defendants as required by law and upon hearing hereof it have a judgment against them for the sum of $1999.80 and costs of suit. That a temporary writ of injunction be granted staying the First National Bank of Mineral Wells from paying the $1500 to the First National Bank of Chicago, and for general and special relief."

There was also attached to the petition an application for a writ of garnishment against the Bank of Mineral Wells upon an affidavit charging that this bank was indebted to and had in its hands funds belonging to the appellant and the Block-Pollak Iron Company. It does not otherwise appear whether or not the Bank of Mineral Wells was made a party to this suit. It filed no answer, and we can not say from the reading of the petition that an effort was made to make it a party. The Block-Pollak Iron Company filed no answer. The appellant, Bank of Chicago, answered by general and special exceptions, a general denial, and specially alleged the purchase and ownership of the draft drawn by the Block-Pollak Iron Company on the appellee, its collection by the Bank of Mineral Wells, the failure of the latter to remit $1500 of the sum collected, and the subsequent recovery of a judgment for that sum against the Bank of Mineral Wells. A copy of the judgment is attached and referred to as a part of the answer. It is also alleged that the appellee was a party to the suit in which that judgment was rendered, and withdrew from the same when the court announced its judgment.

After the conclusion of the evidence, under a peremptory instruction from the court, the jury returned the following verdict: "We, the jury, find for plaintiff against all of the defendants the $1500 fund held by the First National Bank of Mineral Wells." Upon that verdict the court entered the following judgment: "It is therefore ordered, adjudged and decreed by the court that the Mineral Wells and Lakewood Park Street Railway Company do have and recover jointly and severally of the defendants, Block-Pollak Iron Company and the First National Bank of Chicago, Illinois, the said $1500 fund now held by the First National Bank of Mineral Wells, Texas; for all of which execution may issue." From that judgment the Bank of Chicago alone has appealed.

The facts adduced upon the trial were substantially, and in many instances literally as we have stated them in the foregoing summary. There was no evidence offered in support of the charges of fraud and collusion between the appellant and the Block-Pollak Iron Company, or of notice on the part of appellant of any failure of consideration in the contract between the appellee and the Block-Pollak Iron Company, till after the payment of the draft by the appellee.

The unique character of this judgment, when viewed in the light of the pleadings and the evidence, has made the task of determining the proper method of disposing of this appeal somewhat perplexing. On account of its variance from the only relief legitimately authorized by the nature of the action, and the entire absence of any proof to warrant a decree of that kind, we were at first constrained to regard it as an incomplete adjudication of the issues involved, and one over which we could not assume jurisdiction on appeal. But treating the judgment as in effect a denial of all the relief asked for by the plaintiff, except that which was specifically granted, it may be regarded as final, within the meaning of the statute regulating appeals. Whatever doubts we entertained upon this question have been resolved in favor of that course best calculated to settle the controversy and end the litigation; and we therefore set aside the order formerly made dismissing this appeal, and will now dispose of the case upon its merits.

The judgment rendered is susceptible of one of two interpretations: It either merely determines that the appellee is entitled to a particular fund held by the Bank of Mineral Wells, or adjudges that the plaintiff in the suit is entitled to recover that amount of money from the defendants personally. If we treat it as the award of a particular fund, and not as the adjudication of a personal liability against the appellant and its co-defendant, then in order that it may be sustained there must be something in the pleadings and the evidence to establish on the part of the appellee a right, or title, to this fund, or some interest commensurate with the recovery obtained. The facts relied on for this purpose are, that the "fund" held by the Bank of Mineral Wells was a part of the proceeds of what was paid as the purchase price of the goods delivered by the iron company under its contract, and that there had been a partial failure in the consideration. The right to follow this money as proceeds of that payment would depend upon many conditions not present in this case. Whatever may be said of the sufficiency of the averments in the petition, the facts proved failed to show any fraud chargeable to either of the defendants in the suit. There was nothing more than the simple breach of a contract to furnish steel of a certain standard in quality. Again, the right to follow proceeds as such in cases like that here under consideration would depend upon the right of the complaining party to rescind the contract. "If the vendee of goods, in cases where there is either an express or an implied warranty, would rescind the sale and recover back the purchase money, he must, within a reasonable time return the goods, or offer to return them, unless, indeed, the goods are wholly worthless; in which latter case the

vendee is not obliged to return them, or offer to return them, before he can sue and recover back the price, or defend against an action for the price." Brantley v. Thomas, 22 Texas, 270, 73 Am. Dec., 264; Blythe v. Speake, 23 Texas, 429; Scalf v. Thompkins, 61 Texas, 477. Clearly this proceeding is not an action based upon a rescission of the contract with the iron company, and the judgment can not be sustained upon principles applicable to one of that kind.

The appellee having elected to retain the goods and sue for damages for a breach of the warranty, the right to subject that "fund," or, more correctly speaking, the debt due from the Bank of Mineral Wells, would depend upon the personal liability of the owner of the fund, or the one to whom the debt was due and payable. The party who made the warranty is the one who is responsible for the breach. The evidence shows that the appellant bank acquired the ownership of the draft by endorsement in the ordinary course of business, and paid a valuable consideration therefor by giving the endorser credit on its books for the amount of the draft less the usual discount. It is uncontroverted that appellant then had no notice of any non-compliance with the terms of the contract on the part of the iron company. Under those circumstances appellant was an innocent purchaser for value. In accepting the draft with the bill of lading attached, it did not become a warrantor of the quality and quantity of the goods therein described. Blaisdell v. Bank, 96 Texas, 629, 97 Am. St., 944, 62 L. R. A., 968, 75 S. W., 292. Counsel for appellee insist that appellant is liable to the extent of this fund by reason of the fact that after payment was made to the Bank of Mineral Wells, and before its transmission to appellant, the latter was notified of the failure of the consideration, and at that time had in its possession funds belonging to the iron company more than sufficient to satisfy the demands of the appellee for the loss it had sustained. In support of that proposition we are referred to the case of State Bank v. Blakey & Co., 35 Texas Civ. App., 87, 79 S. W., 331. That case was decided by the Court of Civil Appeals upon the authority of Van Winkle Gin Co. v. Citizens Bank, 89 Texas, 147, 33 S. W., 862. The facts disclosed in the latter case show that the suit was instituted by the endorsee of a draft which had been presented and accepted by the drawee, but that when payment was demanded it was refused upon the ground that there had been a failure of consideration. Suit was instituted by the endorsee against the acceptor, and the plea of failure of consideration was interposed by the defendant. In reply to that plea the plaintiff bank alleged that it was a purchaser of the draft for value and without notice. The question was whether such a plea was available. The Supreme Court held that it was, but based its ruling upon these further facts: It was shown that the endorsee was a bank receiving deposits of money, and at the time the draft was dishonored it had funds in its hands belonging to the endorser more than sufficient to pay the face of the draft, and which it might at its option have applied to the extinguishment of the endorser's liability thereon. The court holds that the bank had the undoubted right to say to the endorser, "You

have endorsed to us a paper which, as between you and the acceptor, the latter ought not to pay. We have money belonging to you in our hands sufficient to satisfy your contract of endorsement now due, and we elect to avail ourselves of our equitable right to apply same as an offset and in settlement of your contract and return to you the paper rather than pursue the innocent acceptor in another jurisdiction, especially since such pursuit can not possibly be necessary for our protection. We will not use the shield thrown around us by law solely for our protection as innocent purchasers as a subterfuge to aid you in enforcing through us an unjust demand." Proceeding further, the court uses this language: "Such a position would have been unassailable in morals and in law. The bank, however, elected the contrary. The case then comes to this: the endorser in good conscience should pay. The bank has its funds in its hands sufficient to satisfy the demand, with a perfect right in equity to offset same in satisfaction of the bill. The pursuit of the acceptor in a foreign jurisdiction is clearly not necessary to the bank's protection, but can only serve to allow the endorser to avail himself of the protection given by law to an innocent purchaser, in order to cut the acceptor off from a just defense and compel it to pay a sum of money which, in equity, it should not pay. Under these circumstances, with knowledge of the failure of consideration probably at the time of filing the original answer, but certainly when the depositions of its officers were taken as above stated, it presses its claim to judgment upon its claim of innocent purchaser in a suit instituted at the instance and expense of the endorser. While expressly waiving its equitable right to offset the deposit conferred upon it by law for its protection, and which appears in this case to have been adequate to its complete protection, it invokes the application by the court of another equitable principle, not for its protection, but for the sole and evident purpose of aiding the endorser to obtain an undue advantage over the acceptor. We are of the opinion that, under these circumstances, and for such a purpose, the bank was not entitled to the protection afforded by law to an innocent holder, and that as between it and the acceptor the deposit should be offset against the bill."

The facts of that case are radically different from those involved in this. There the draft had been accepted, but not paid, and the liability of the endorser still existed. Here the draft had been paid and the endorser discharged before the holder acquired notice of the failure of the consideration. If through the transfer of the iron company the appellant acquired the ownership of the draft, that necessarily carried with it the title to whatever was paid on it, and a payment to the Bank of Mineral Wells, its collecting agent, was, in so far as the parties to the instrument were concerned, a payment to the appellant, and operated to discharge the endorser. In the case referred to the Supreme Court rested its holding that the plea of failure of consideration was available against the endorsee, upon the ground that at the time of the dishonor, and of notice of the defense urged, the latter was in an attitude to easily reimburse itself out of funds in its hands belonging to

the endorser. It was also apparent that the bank was being used merely as an agent of the party liable for the breach of the contract. It is true that in this case at the time this defense was made known to the appellant it had in its hands funds belonging to the endorser sufficient to satisfy the appellee's demand for damages, but at that time the liability of the endorser had ceased, and the remedy of the endorsee in the case referred to was not available in this. Neither was there any evidence of the charge that appellant acted for the iron company in making this collection.

There is nothing in the record to impeach the *bona fides* of the transaction between the appellant and the iron company. The record shows that some time prior to being made a party to this suit appellant had recovered a personal judgment against the Bank of Mineral Wells for the failure to pay over the very "fund" referred to in the judgment. The relation of those two banks to each other, then, if not before, became that of creditor and debtor. The attempt to subject this so-called "fund" to the satisfaction of the claim of the appellee for damages for the breach of contract by the iron company was nothing more than an effort to reach a debt due to a party in no way responsible for those damages.

From the evidence contained in the record there was no warrant for either a personal judgment against the appellant bank, or for one against its debtor in any proceeding akin to garnishment. In view of the testimony, in which there appears to be practically no conflict, we think the court should not only have withheld the peremptory instruction given in favor of the appellee, but should have directed a verdict for the appellant. The judgment of the District Court will, therefore, be reversed and judgment here rendered for the First National Bank of Chicago. While the evidence is wholly insufficient to sustain any judgment against the iron company, there being no appeal by it, in so far as that defendant is affected the judgment will be undisturbed.

*Reversed and rendered.*

Writ of error refused to M. W. & L. P. St. Ry. Co.